### HISTORY COMPANY v. E. S. FLINT.

(No. 3072.)

APPEAL from Galveston County. Opinion by DAVIDSON, J.

WAUL & WALKER, counsel for appellant.

W. B. DENSON, counsel for appellee.

§ 224. *Contract; failure of consideration; representations, etc., of agent binding on principal; rescission of contract; fraud; case stated.* Appellant sued appellee in the justice's court for the sum of $154. This amount was the alleged contract price of twenty-eight volumes of the works of Bancroft, agreed to be paid appellant by appellee. It was claimed by appellant that he had de-

livered to appellee twenty-seven volumes of said works, and that appellee had received same. This was denied by appellee. Appellee answered, setting up an alteration of the alleged contract. He further answered, alleging fraud and fraudulent representations in obtaining said contract or order for the books, and failure of consideration of said contract. The order for the books is as follows, to wit: "To the History Company, publishers of the literary works of Hubert Howe Bancroft — Gentlemen: In token of my high appreciation of the value to the west and south and to the world of the literary works of Hubert Howe Bancroft, and of your efforts in placing them before the public, I hereby subscribe for one complete set of said literary works, in thirty-nine volumes, in number and style of binding as designated below, payments to be made at the regular published prices as the volumes are issued and delivered. Bound in library, at $5.50 per volume. The twenty-seven volumes now issued to be delivered at once, and the others, one every three months, as issued. All volumes to be paid for as delivered. E. S. FLINT." This order was obtained by L. S. Hatch, a traveling agent of the appellant, on April 11, 1888. He was soliciting subscriptions for the appellant at the time the above order was obtained in the city of Galveston for the literary works of said Hubert Howe Bancroft. On the last above mentioned date said Hatch, in the said city of Galveston, solicited, at his office, an interview with appellee. Appellee went to the office of said Hatch to ascertain what was desired of him, when he was told by Hatch that he (Hatch) was engaged in collecting material and information upon which to complete a set of historical works written and to be written by said Bancroft, a portion of which works were then complete and published, and a portion still incomplete and unpublished; that the incomplete portion of said works was to comprise a history of Texas from the beginning on down

to that period of time at which said interview took place, which history of Texas was to include, among other things, biographical sketches of prominent political and business men of the state, and that he (Hatch) desired to procure from the appellee the leading events of his (appellee's) life, upon which to base and write a biographical sketch of appellee. Appellee submitted to a long and searching interview with Hatch, during which Hatch propounded and received answers to a great many questions from appellee, comprising a detailed account of his life and leading events thereof. After this interview was finished, Hatch desired appellee to subscribe for the Bancroft historical works, holding out to appellee as inducement to secure the said subscription that his biography would appear in the history of Texas, which was yet to be published, as well as that of many other prominent citizens of Galveston and Texas, who were appellee's friends, associates and acquaintances, and promised appellee that a sketch of his life, based on the information just obtained, should appear in said history of Texas. Appellee, being induced by the said consideration of having his life's history appear in said book, made the order above set forth. In about fifteen minutes after said contract or order was signed appellee returned to Hatch's office to see him and countermand the order for the books. Hatch not being in, appellee made a written countermand of said order, and left it with Hatch's clerk, to be delivered to him. Twenty-seven volumes were, however, sent that same evening to appellee's room in the absence of appellee, and were receipted for by one Clegg, who had no authority to receive or receipt therefor. These books were not received by him, as appellee claims. Within a short time thereafter — a day or two — appellant's agent, Hatch, sent his clerk to call upon appellee for the purpose of collecting the bill for the twenty-seven volumes claimed to have been delivered to appellee, whereupon payment was refused by

appellee.   Whether or not the promised volume of Texas history was ever delivered or tendered to appellee is not shown, but, if so, it was likewise rejected, as is evidenced by the fact of this suit.   The said volume contained no biographical sketch of appellee, and no allusion to him in any way, nor to any of the named friends spoken of between Hatch and himself.   Suit was brought by appellant, and the books were tendered him by appellee, and were rejected by him.   Judgment was rendered for appellee in the county court, hence the appeal to this court.

As matter of law the trial judge found that the sole inducement for appellee's subscription to said historical works was Hatch's promise and agreement that a biographical sketch of appellee should appear with that of other prominent political and business men of Galveston and Texas, associates, friends and acquaintances of appellee, in the forthcoming volume of Texas history, and, appellant having wholly failed to mention appellee in said history, as promised, the consideration wholly failed and rendered appellee not liable in the contract.   Appellant filed exceptions to answers of appellee, based upon the theory that said answers sought to vary the written contract entered into by appellee after admitting his signature to same.   The appellee admits signing the order, but he alleges that, after so signing it, it was altered and changed by adding thereto without his consent or knowledge; but that matter will not affect the result of the case as we view it, therefore it will not be noticed.   Do the matters and things set up in the answer seek to vary the written order for the books?   We think not.   By the answer it is not proposed to vary the contract in any manner, but only to avoid its effects and terms *in toto*.   It is not proposed to change, alter or vary any of the terms or expressions of the written order, but it is proposed to defeat it in its entirety, because it was obtained by fraud and misrepresentations.

It is alleged that the contract is vicious, because of the false representations and failure to comply with the agreement that induced the contract, and thus it is sought to hold for naught the entire contract. Appellee's answer pleads matter in avoidance of the whole contract, and for the purpose of avoiding the whole contract. The general rule is well established that parol evidence is inadmissible to contradict or vary the terms of a written instrument. [1 Greenl. Ev., §§ 275, 276; Heatherly v. Record, 12 Tex. 50; Smith v. Garrett, 29 Tex. 52; Self v. King, 28 Tex. 553; Reid v. Allen, 18 Tex. 243.] But it is equally well settled that a written contract may be contradicted when fraud is alleged. [White & W. Cond. Civ. Cas., § 8.] Parol evidence is always admissible to prove fraud or mistake in a written contract. [2 Willson, Civil Cas. Ct. App., § 2; 1 Greenl. Ev. § 284; Dunham v. Chatham, 21 Tex. 245; Weir v. McGee, 25 Tex. Supp. 31.] Fraud vitiates all contracts, whether simple contracts or specialties. [Stacy v. Ross, 27 Tex. 4, 5.] To avoid a contract on the ground of misrepresentation of a material fact constituting the basis of the contract, the contract must have been entered into upon the faith and credit of such representations. [2 Willson, Civil Cas. Ct. App., § 394; Jackson v. Stockbridge, 29 Tex. 394; White & W. Civil Cas. Ct. App., § 1289; Taylor v. Fleet, 1 Barb. 475.] "Nothing can be better settled than that fraud vitiates every contract, and may consist either in misrepresentation or in concealment. Every misrepresentation with regard to anything which is a material inducement to a sale, which is made to deceive, and which actually does deceive, the vendee, vitiates the contract of sale." [Wintz v. Morrison, 17 Tex. 383.] "Fraud renders all contracts voidable *ab initio*, both at law and in equity. No man is bound by a bargain into which he has been deceived by a fraud, because assent is necessary to a valid contract, and there is no real assent where fraud and deception have been used as

instruments to control the will and influence the assent."
[Benj. Sales, § 428.] Without pursuing this subject fur-
ther, we are of opinion that the exceptions urged to ap-
pellee's answer are not well taken, and the court did not
err in overruling same.

Appellant proposed to prove by Hatch and Stone that
Hatch, as agent of appellant, had no authority to agree
with appellee or promise him to include his (appellee's)
biographical sketch in the forthcoming volume of Ban-
croft's works. This testimony was objected to, and the
objections sustained, and the testimony was excluded.
Appellant urges error on this ruling. Hatch was the
trusted agent of appellant to gather up material in Texas
for the history of Texas, as well as to sell the books.
This is proven by appellant. He had the authority to
secure the biographical sketches and memoranda for the
proposed and contemplated volume of the history of
Texas. He was securing this information as he could, and
in many instances in the city of Galveston. Several of
Galveston's prominent citizens were interviewed, whose
biographical sketches were introduced into a former vol-
ume of the Bancroft histories. Hatch's contracts and
acts in this respect were fully recognized and indorsed
by his principals. Hatch's authority was recognized and
indorsed by appellant in the matter involved in this suit,
as is fully evidenced by the letter incorporated in the rec-
ord. Not only so, but the suit itself against the appellee,
taken with the facts of the case, show not only Hatch's
authority, but appellant's indorsement and ratification of
Hatch's acts and contract. "That a party is agent for
another does not render such other liable for every con-
tract the agent may make. To be binding upon the
principal the contract must come within the apparent
scope of the agent's authority. With regard to special
agents the rule is that if the agent exceeds the special
and limited authority conferred on him, his principal is
not bound by his acts, but they become mere nullities, so

far as he is concerned, unless, indeed, he has held him out as possessing more enlarged authority." [2 Willson, Civil Cas. Ct. App., § 234; Story, Ag. (9th ed.), § 126.] Tested even by this rule appellant would be liable for the acts of Hatch in relation to the contract with appellee. A principal could not be heard to deny the authority of his agent to make the contract when he has accepted same, and seeks to take advantage of that portion of it that is beneficial to his interest while rejecting that that does not conform to his wishes. [Henderson v. Railway, 17 Tex. 580; Greenwood v. Pierce, 58 Tex. 132; 1 Story, Eq. Jur., § 193; Story, Ag., § 56; Barrie v. Earle, 143 Mass. 5.] "A principal is bound by the acts done and by the knowledged possessed by his agent concerning facts attending the transactions of such agent performed in the scope of his duty and authority." [White & W. Cond. Civil Cas., § 1290.] Mr. Story says: "Whether the party thus misrepresenting a material fact knew it to be false, or made the assertion without knowing whether it were true or false, is wholly immaterial, for the affirmation of what he does not know or believe to be true is equally, in morals and law, as unjustifiable as the affirmation of what is known to be positively false." [Story, Eq. Jur., notes 8, 9. See, also, Frenzel v. Miller, 37 Ind. 1.] "The same general principles apply whether the fraud was perpetrated by the party directly interested or by the agent, if the act in which the fraud was committed be adopted by the principal. If the latter persists in taking the benefit of his agent's fraud it is immaterial whether the fraud was originally concocted by the principal or by the agent; the principal will be implicated to the fullest extent if he adopts the acts of his agent." [Story, Eq. Jur., § 193a.] The law seems to be that the principal is as liable for the fraud of his agent in the course of his employment as for any other tort. [Udell v. Atherton, 7 Hurl. & N. 172; Barwick v. Bank, L. R. 2 Exch. 259; Sutton v. Wilders, L. R. 12 Eq. 373.] Applying the rules

above laid down to the facts of this case and the case it-
self as presented to us, we are of the opinion that appel-
lant was bound by the acts of his agent in the contract
with appellee, and he cannot be heard to deny Hatch's
authority in making the representations to appellee that
induced the contract entered into and sued on in this
case.   The rejection of said evidence, therefore, was not
error.

It is also contended that no reason is shown why a re-
scission of the contract should obtain.  Passing the inter-
mediate steps taken by appellee to repudiate the contract,
we find that on the trial he tendered the books to appel-
lant, and set up the fraud and failure of consideration,
and asked to be relieved of the contract on account of
the fraudulent matters set up. This he had a right to do.
"In every case where a buyer has been imposed on by
the fraud of the vendor, he has the right to repudiate the
contract,—a right correlative with that of the vendor to
disaffirm the sale when he has been defrauded.   The
buyer, under such circumstances, may refuse to accept
the goods if he discover the fraud before delivery, or re-
turn them if the discovery be not made until after deliv-
ery; and then, if he has paid the price, he may recover
it back on offering to return the goods in the same state
in which he received them.   .   .   .   But the contract is
only voidable, not void; and if, after discovery of the
fraud, he acquiesces in the sale by express words, or by
any unequivocal act, such as treating the property as his
own, his election will be determined, and he cannot after-
wards reject the property." [Benj. Sales, § 452.  Au-
thorities collated in notes a, b and c to said section 452.]
"The party defrauded may, instead of rescinding the
contract, stand to the bargain even after he has discov-
ered the fraud and recover damages for the fraud; or he
may recoup in damages if sued by the vendor for the
price. · The affirmance of a contract by the vendee after
discovery of the fraud merely extinguishes his right to

rescind. His other remedies remain unimpaired." [Id., note a to § 452; Whitney v. Allaire, 4 Denio, 554; Rice, J., in Herrin v. Libbey, 36 Me. 357; Peck v. Brewer, 48 Ill. 55; Weimer v. Clement, 37 Pa. St. 147; Van Epps v. Harrison, 5 Hill, 68; Foulk v. Eckert, 61 Ill. 318; Lilley v. Randall, 3 Colo. 298; Miller v. Barber, 66 N. Y. 558; Johnson v. Luxton, 41 N. Y. Super. Ct. 481; Lexow v. Julian, 14 Hun, 152; Ranney v. Warren, 17 Hun, 111; Krumm v. Beach, 25 Hun, 293.] The contract was an entirety. In this case the appellee had the right to rescind the contract. This would be so even if the failure of consideration was only partial. [Benj. Sales, § 426; Morse v. Brackett, 98 Mass. 208; 104 Mass. 494; Carpentier v. Minturn, 65 Barb. 297; Mansfield v. Trigg, 113 Mass. 350.] But the appellee is relying upon fraud in the incipiency of the contracts as the means of avoiding the entire contract,— fraud that was the inducing cause for entering into the contract and that prevailed upon him as the basis of this suit. Appellee's pleas and evidence went to the whole contract, and to it as an entirety. He could avoid it for fraud and rescind it *in toto*. It was not too late for him to do so when he was sued under the facts of this case. This he could do by tendering the books to appellant at the trial, and then and there demand the rescission of the contract. If the appellee had the right to avoid the contract for the fraud and exercised it, he had a valid defense to the action or suit of the appellant. [Clark v. Baker, 5 Metc. (Mass.) 452; Mining Co. v. Jones, 108 Pa. St. 55; Barrie v. Earle, 143 Mass. 1, 4, 5.]

The case of Barrie v. Earle, 143 Mass. 1, is a case directly in point. In that case Earle subscribed for one copy of the "Art Treasure of America," in ten folios, at $15 each, as published, and agreed to pay for each portfolio as delivered. Two deliveries were made, and the requisite $30 was paid therefor. Later on two more deliveries were made, but they were not paid for, and suit

was instituted for the contract price of $15 for each port-folio, and Earle answered, setting up fraud as against the written contract order for the books. He did not offer or propose to rescind the contract, and did not return the books to the plaintiff, but sought to retain the books and avoid the payment therefor. He offered on the trial to prove the fraud and fraudulent representations of plaint-iff's agent. This evidence was excluded upon the ground that the contract was entire, and that the defendant could not avoid it except by returning the two port-folios which he had received and paid for. The court held that the contract was an entirety, although the per-formance was several; and "as is said in Denny v. Will-iams, 5 Allen, 1, 4," it is a contract, "one and entire in its origin; and yet, looking to the performance of differ-ent things at different times, it may be divisible in its operation; that, although an action under it could be maintained for the price of each portfolio as it was de-livered, yet that the contract is one entire agreement to take one copy of a publication made up of ten parts or portfolios, all constituting the Art Treasures of America; and that it is not a contract containing ten distinct and independent agreements to take ten different portfolios, one under each agreement. [See Vinton v. King, 4 Allen, 562.] The defendant's evidence went to the whole con-tract, and was offered for the purpose of avoiding the whole contract; and he could only avoid the contract for fraud in its inception by rescinding *in toto*, and by restoring to the plaintiff the portfolios which he had re-ceived. If the defendant had a right to avoid the con-tract, and exercised that right, he had a defense to this action, and could recover in an action brought by him the $30 he had paid, and the portfolios would all belong to the present plaintiff; but the defendant could not re-tain part of the portfolios under the contract and avoid the contract as to the rest. [Clark v. Baker, 5 Metc. (Mass.) 452; Morse v. Brackett, 98 Mass. 205; Mansfield

v. Trigg, 113 Mass. 350; Manufacturing Co. v. Wakefield, 121 Mass. 91.] It does not follow from this that the defendant was required to receive any portfolios that were not such as the contract called for, or that, if the plaintiff did not from time to time offer to the defendant ten folios each of which satisfied the description contained in the contract, the defendant might not recover damages for a breach of the contract by the plaintiff." [Barrie v. Earle, 143 Mass. 4, 5.] The contract in this case was an entire one in its origin, but several in its performance. The contract contained the stipulation: "I hereby subscribe for one complete set of said literary works, in thirty-nine volumes, in number and style of binding as designated below; payments to be made at the regular published prices as the volumes are delivered." At the conclusion of this order is found this language also: "All vol's to be paid for as delivered." This made an entire contract in its origin, but several in its performance,—the books were to be paid for as delivered. The contract was repudiated almost from its creation; the books were refused acceptance, the bills for the books were refused payment by appellee, and finally, when the suit was brought, the books were tendered into court to appellant, and a rescission asked. The trial court found that the contract was obtained through fraud, and was without consideration, and we see no reason why that judgment should be disturbed. The court found the facts, and we see no reason why we should disturb that finding.

March 7, 1891.                                   Affirmed.

WHITE, P. J., did not sit in this case.